UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SABRINA BROWN,

     Plaintiff,                            Case No. 15-cv-13349
                                                Hon. Matthew F. Leitman

v.

EXCELDA MANUFACTURING
COMPANY, INC.,

     Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF #25)

In this action, Plaintiff Sabrina Brown ("Brown") alleges that Defendant Excelda Manufacturing Company ("Excelda") unlawfully retaliated against her – by terminating her employment – for taking leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601 *et seq.* Excelda has now moved for summary judgment. For the reasons explained below, the Court **GRANTS** Excelda's motion.

## I

## A

From December 28, 1998 to May 2015, Brown worked for Excelda as a production associate. (*See* Brown Dep. at 29, ECF #25-2 at 10, Pg. ID 186; Termination Letter, ECF # 25-21 at 2, Pg. ID 482.) She reported to production

1

supervisor Robert Harris ("Harris") from 2012 to August 2014.[1] (*See* Harris Dep. at 19 and 27, ECF #27-6 at 5 and 7, Pg. ID 628 and 630.)  Thereafter, Brown reported to production supervisor Barbara Marie Wolfe ("Wolfe"). (*See* Wolfe Dep. at 23, ECF #25-3 at 7, Pg. ID 303.)  Harris and Wolfe reported to Daniel St. George ("St. George"), the manager of Excelda's production department. (*See* St. George Dep. at 7, ECF #25-4 at 3, Pg. ID 317.)

## B

During Brown's employment at Excelda, the company granted her a substantial amount of FMLA leave and other leave without incident.  The Court summarizes these periods of leave below.

## 1

Brown requested FMLA leave on three separate occasions while she worked at Excelda, and the company approved all three requests.  First, Brown took FMLA leave for the birth of her son in 2001. (*See* Brown Dep. at 44-45, ECF #25-2 at 14-15, Pg. ID 189-190; February 2001 FMLA Request Form, ECF #25-12 at 5, Pg. ID 427.)  When Brown returned from that FMLA leave, Excelda reinstated her to the same production associate position that she held prior to taking leave. (*See* Brown

---

[1] Excelda's production department has a three tier management structure. Production associates like Brown report to a production supervisor. (*See* Brown Dep. at 32, ECF #25-2 at 10, Pg. ID 186; Daniel St. George Dep. at 13-14, ECF #25-4 at 5, Pg. ID 319.)  Production supervisors in turn report to the production manager, who is the highest ranking employee in Excelda's production department. (*See id.*)

Dep. at 52, ECF #25-2 at 15, Pg. ID 191.)  Brown admits that she did not have "any issues" with the way Excelda handled her 2001 FMLA leave. (*Id.*)

Next, on September 30, 2008, Brown took intermittent FMLA leave to care for her mother. (*See id*. at 105-107, ECF #25-2 at 29, Pg. ID 205.)  When Brown returned from this FMLA leave, Excelda reinstated her to the same production associate position that she held prior to taking leave. (*See id.* at 110-11, ECF #25-2 at 30, Pg. ID 206.)  Brown concedes that she was "not written up or disciplined as a result of any of [the] FMLA absences" that resulted from caring for her mother. (*Id.* at 110, ECF #25-2 at 30, Pg. ID 206.)

Finally, on July 29, 2014, Brown requested intermittent FMLA leave for her own health condition (severe menstrual cramping). (*See id*. at 150-152, ECF #25-2 at 40, Pg. ID 216.)  On August 14, 2014, Excelda approved Brown's request through August 4, 2015. (*See id.*; August 2014 FMLA Designation Notice, ECF #25-14 at 2, Pg. ID 438.)  Brown thereafter used eight days of her intermittent FMLA leave in 2014 and another six days of intermittent FMLA leave during the first five months of 2015. (*See* Brown Time Card, ECF #25-15.)  She admits that she "got all of the FMLA leave that [she] requested and needed as it relates to [her] menstrual cramping" and that she "was not written up for any of the days that [she] used FMLA leave in 2014 or [2015]." (Brown Dep. at 152, ECF #25-2 at 40, Pg. ID 216.)

**2**

Excelda also granted Brown time off for personal reasons.  In April 2003, Excelda allowed Brown to take time off when her sister suffered an aneurysm. (*See id*. at 88, ECF #25-2 at 24, Pg. ID 200.)  Because care for a sibling is not an FMLA-qualifying absence, Excelda allowed Brown to "make a one-time transfer of 20 hours of vacation [time] into sick/emergency time" to care for her sister. (*Id*. at 88-89, ECF #25-2 at 24-25, Pg. ID 200-01.)  Brown agreed that this "was a favorable action" by Excelda. (*Id.*)

Moreover, in June 2009, Excelda granted Brown an additional 80 hours of unpaid time off because she had exhausted all of her available paid time off ("PTO") and "accumulated 36.25 additional hours of unpaid time [off]; [comprising of] four excused instances, and three unexcused [instances]." (August 2009 Letter to Brown, ECF #25-17 at 2, Pg. ID 471.[2])  Brown agreed that Excelda did not have to provide her with the additional time off and that doing so was a "favorable action" that "help[ed] prevent [her] from being terminated" for additional attendance problems. (Brown Dep. at 116, ECF #25-2 at 31, Pg. ID 207.)

---

[2] Brown does not dispute the contents of this letter. (*See* Brown Dep. at 113-116, ECF #25-2 at 31, Pg. ID 207.)

## C

Over the course of Brown's employment with Excelda, she had attendance and behavior issues.  For instance, she received a total of nineteen disciplinary actions for violating Excelda's "Attendance and Punctuality" policy (the "Attendance Policy"). (*See* Compilation of Disciplinary Notices, ECF #25-10 at 2-27, Pg. ID 393-419; January 2015 Coaching and Corrective Action Notice, ECF #25-18 at 2-4, Pg. ID 474-76.)[3]  Notably, Brown does not claim that any of these actions related to the FMLA-approved absences described above.[4]

Moreover, Brown was openly hostile toward her supervisors in January 2015. The hostility grew out of an interaction between Brown and Wolfe (her direct supervisor at the time) on January 13, 2015.  According to Wolfe, she encountered Brown and a co-worker, Marvin Barnett ("Barnett"), in the kitchen area at 7:35 a.m. (*See* Wolfe Dep. at 28, ECF #25-3 at 8, Pg. ID 304.)  Brown's presence in the kitchen at that time violated the Attendance Policy which required Brown to be at her machine (rather than in the kitchen) by 7:35 a.m. (*See* January 2015 Disciplinary

---

[3] The Attendance Policy is attached to Defendants' motion for summary judgment. (*See* ECF #25-7 at 1-3, Pg. ID 386-88.)  Brown acknowledged that she received a copy of the Attendance Policy. (See Associate Acknowledgement of Receipt, ECF #25-8 at 2, Pg. ID 390; Brown Dep. at 54, ECF #25-2 at 16, Pg. ID 192, confirming that she signed the Associate Acknowledgement of Receipt.)

[4] (*See* Brown Dep. at 41, 81, 85, 91, 92, 95, 96, 98, 99, 100, 104, 110, 122, 129-130, 143, 152-55, 159, 185, 189, 191-92; ECF #25-2 at 13, 23-28, 30, 33, 35, 38, 40-42, 49-50, Pg. ID 189, 199-204, 206, 209, 211, 214, 216-218, 225-226. )

Notice, 25-18 at 2, Pg. ID 474.)  Wolfe wrote Brown up for this violation, and Brown was eventually summoned to a meeting with Wolfe and St. George (Wolfe's supervisor) to discuss her conduct. (*See* Brown Dep. at 181, ECF #25-2 at 48, Pg. ID 224.).  During that meeting, Brown "holler[ed]," told Wolfe and St. George that she was tired of them "f[uck]ing with [her]," and "storm[ed] out." (*Id.* at 185-86, ECF #25-2 at 49, Pg. ID 225.)

After storming out of the meeting, Brown went to see Jennifer Oliver ("Oliver"), a generalist in Excelda's human resources department. (*See id.*; Oliver Dep. at 7, 25-26, ECF #25-5 at 3, 8, Pg. ID 341, 346.)  Brown complained that she "didn't want to deal with [Wolfe] anymore" and asked Oliver to "fire" her (Brown). (Oliver Dep. at 25-26, ECF #25-5 at 3, 8, Pg. ID 341, 346.)  Oliver did not fire Brown as Brown had requested. (*See id.*) And although St. George, Wolfe, and Oliver could have disciplined Brown for her behavior that day, there is no evidence in the record indicating that they did so.  At the time, Brown had been on intermittent FMLA leave for five months. (*See* August 2014 FMLA Designation Notice, ECF #25-14 at 2, Pg. ID 438.)

## D

Brown also had difficulties at Excelda because she relied upon Barnett to drive her to and from work.  When Barnett was forced to leave work early, Brown had to

leave early as well.  Brown's reliance on Barnett caused problems for Excelda, but Excelda nonetheless tried to work with Brown to address the situation.

Brown's reliance on Barnett first caused concern for Excelda on February 23, 2015. (*See* Barnett Dep. at 29-30, ECF #25-6 at 9, Pg. ID 363.)  That day, Barnett asked Wolfe whether he could leave early due to a family emergency. (*See id.*)  Wolfe granted Barnett's request. (*See id.*)  Brown decided to leave early with Barnett, but she did not seek out Wolfe, her supervisor, to let her know that she was planning to leave work early.  Instead, Wolfe later approached Brown and asked Brown whether she was leaving work early with Barnett or whether she had secured a different ride home. (*See* Wolfe Dep. at 33-34, ECF #25-3 at 10, Pg. ID 306.)  Brown told Wolfe that she was going to leave early with Barnett. (*See id.*)  Wolfe allowed Brown to depart early despite Brown's failure to seek permission in advance. (*See id.*)

On March 2, 2015, Barnett asked for and was granted permission to leave early because his mother passed away. (*See* Barnett Dep. at 31, ECF #25-6 at 9, Pg. ID 368.)  Brown again left early with Barnett. (*See* Brown Dep. at 196, ECF #25-2 at 51, Pg. ID 227.)

On March 5, 2015, St. George held a meeting with Brown to discuss her two early departures due to Barnett's emergencies. (*See* Brown Dep. at 192-206, ECF #25-2 at 50-54, Pg. ID 226-30.)  St. George  "explained to [Brown] that attendance

7

is her responsibility, not that of the associate she carpools with, and that having a backup plan in situations where she could get another associate to give her a ride would be a good option." (*Id.*)  He further advised Brown that "she is currently out of PTO time and that any further time off needed to be pre-planned and excused." (*Id.* at 204, ECF #25-2 at 53, Pg. ID 229.)

During the March 5 meeting, St. George also asked Brown whether she planned on attending Barnett's mother's funeral the next day. (*See id.* at 207, ECF #25-2 at 54, Pg. ID 230.)  When Brown responded that she did plan to attend the funeral, St. George explained to Brown that this was yet another example of her planning on taking time off without first informing her supervisor. (*See id.*) Although St. George allowed Brown to attend the funeral, he made clear to Brown that "if [she] need[ed] to take more time off, [she] need[ed] to discuss that with [her] supervisor immediately upon knowing." (*Id.* at 208, ECF #25-2 at 54, Pg. ID 230.)

At the conclusion of the meeting, St. George discussed Brown's behavior during the January meeting at which she hollered and cursed at Wolfe and St. George. (*See id.* at 209, ECF #25-2 at 55, Pg. ID 231.)  St. George told Brown that "being disrespectful towards a supervisor by yelling at them, refusing to listen, and barging out of the conference room would not be tolerated." (*Id.*)

**E**

Brown's reliance on Barnett for transportation ultimately led to a series of events that culminated in her termination. On May 14, 2015, Barnett needed to leave work early to attend an appointment with his wife. (*See* Barnett Dep. at 33, ECF #25-6 at 10, Pg. ID 369.) Barnett told Wolfe, who was supervising him that day, that he needed to depart early, and Wolfe approved his request. (*See id.* at 33-34, ECF #25-6 at 10, Pg. ID 369.)

Brown was again dependent upon Barnett for transportation that day, and thus she needed to leave early with Barnett. (*See* Brown Dep. at 215-16, ECF #25-2 at 56, Pg. ID 232.) But Brown did not personally ask Wolfe for permission to do so nor did she personally discuss her early departure with Wolfe. (*See* Brown Dep. at 216, ECF #25-2 at 56, Pg. ID 232.) Instead, according to Barnett, he told Wolfe that "*we're* both going to go [early]," and he says that the "we" in "we're" meant him and Brown. (Barnett Dep. 33-34, 48, ECF #25-6 at 10, 13, Pg. ID 369, 372; emphasis added.) Barnett says that Wolfe responded "that's fine." (*Id* at 34, ECF #25-6 at 10, Pg. ID 369.) Brown says that based on Barnett's discussion with Wolfe, she (Brown) believed she had Wolfe's permission to leave early with Barnett, and she did so. (Brown Dep. at 215-16, ECF #25-2 at 56, Pg. ID 232.)

Wolfe's recollection of the events of that day differs from Brown's and Barnett's. Wolfe recalls Barnett asking if he could leave early, but she denies that

Barnett said that Brown "was [leaving] with him." (Wolfe Dep. at 37-38, ECF #25-3 at 11, Pg. ID 307.)   Wolfe says that she was surprised when she went to the production floor that afternoon, noticed that Brown was not at her production machine, and learned that Brown had departed early with Barnett. (*See* Wolfe Dep. at 36, ECF #25-3 at 10, Pg. ID 306.)

A few days later, Wolfe drafted a Coaching and Corrective Action Notice in which she recommended that Brown receive a written warning for walking off the job without informing a supervisor. (*See* Wolfe Dep. at 38-40, ECF #25-3 at 11, Pg. ID 307; Draft Coaching and Corrective Action Notice, ECF #25-20 at 2, Pg. ID 480.) Wolfe showed St. George her draft of the Coaching and Corrective Action Notice. (*See* St. George Dep. at 53, ECF #25-4 at 15, Pg. ID 329.)   He told Wolfe that "[he was] not sure that a written warning [was] appropriate" and that they "need[ed] to go talk to Jennifer Oliver in HR." (*Id.*)   During their meeting with Oliver, St. George explained that he did not think that Wolfe's drafted written warning was sufficient punishment, and he asked Oliver for her recommendation regarding an appropriate disciplinary action. (*See id.*)   Oliver recommended that St. George terminate Brown's employment. (*See id.*; Oliver Dep. at 44, ECF #25-5 at 12, Pg. ID 350.)   St. George accepted this recommendation and decided to fire Brown. (*See* St. George Dep. at 54-55, ECF #25-4 at 15, Pg. ID 329.)   According to St. George, the "decision to terminate [Brown] was made based on what happened on [May 14, 2015]." (*Id.*)

On May 19, 2015, Oliver wrote a termination letter to Brown that provided the following explanation for her termination:

> During your employment with Excelda, you have had numerous deficiencies with the attendance policy. This has been discussed with you multiple times; the last of which was addressed with you on March 5, 2015. At that time it was made clear to you by your Manager, Dan St. George, how imperative it is to manage your time, to include advance scheduling of your time off when possible, reducing your excessive tardiness, as well as have reliable back-up mode of transportation when carpool arrangements fall through. Further, you were specifically told that your attendance was your responsibility, and further infractions could result in your employment termination; yet since then, you have had nine separate additional attendance violations. The most recent occurrence was on Thursday, May 14, when you walked-off the job one hour prior to the end of your shift, without notifying your Supervisor or Manager, knowing the potential consequences of this action.

(Termination Letter, ECF #25-21 at 2; Oliver Dep. at 40, ECF #25-5 at 11, Pg. ID 349, in which Oliver confirms that she drafted the termination letter.)

## F

After Excelda fired Brown, she filed this action. In her one-count Amended Complaint, Brown alleges that Excelda retaliated against her in violation of the FMLA, 29 U.S.C. § 2615(a)(2). (*See* Am. Compl., ECF #10 at 7-10, Pg. ID 46-49.) Excelda moved for summary judgment on December 2, 2016. (*See* S.J. Motion, ECF #25.) Brown responded on December 23, 2016. (*See* Pl.'s Resp. Br., ECF #27.) The Court held a hearing on Excelda's motion for summary judgment on March 9, 2017.

## II

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52. Indeed, "[c]redibility determinations, the weighing of the evidence and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

## III

## A

"The FMLA enables employees covered by the Act to take up to twelve weeks of leave per year for various purposes specified in the statute, including the employee's own 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Bryson v. Regis Corp.,*

12

498 F.3d 561, 569-70 (6th Cir. 2007) (quoting 29 U.S.C. § 2612(a)(1)(D).)  "At the

expiration of the employee's leave period, she must be reinstated to her position or

to a position equivalent in pay, benefits, and other terms and conditions of

employment." *Id.* (citing 29 U.S.C. § 2614(a)(1)).

> There are two theories for recovery under the FMLA:
>
> The 'entitlement' or 'interference' theory arises from § 2615(a)(1), which states that '[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter,' and from § 2614(a)(1), which provides that 'any eligible employee who takes leave ... shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position.'  The 'retaliation' or 'discrimination' theory arises from § 2615(a)(2), which provides that '[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.'

*Arban v. W. Pub. Corp.,* 345 F.3d 390, 400-01 (6th Cir. 2003).  Brown is proceeding

under the retaliation theory here.

"A plaintiff can prove FMLA retaliation using direct or circumstantial

evidence." *Ferrari v. Ford Motor Company*, 826 F.3d 885, 897 (6th Cir. 2016).

Brown relies exclusively on circumstantial evidence.  Therefore, the Court evaluates

her claim using the *McDonnell-Douglas* burden-shifting framework. *See Bryso*n,

498 F.3d at 570 (6th Cir. 2007) (applying *McDonnell-Douglas* framework to FMLA

retaliation claim because plaintiff relied only upon circumstantial evidence)**.**  Under

this framework, Brown bears the initial burden of establishing a *prima facie* case of

FMLA retaliation. *See Ferrari*, 826 F.3d at 897.  To make her *prima facie* case, Brown "must show that (1) [she] engaged in activity protected by the FMLA; (2) [Excelda] knew that [she] was exercising FMLA rights; (3) [she] suffered an adverse employment action; and (4) that there was a causal connection between the protected FMLA activity and the adverse employment action." *Id.*  "A plaintiff's burden in establishing a *prima facie* case is not intended to be an onerous one." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001) (citing *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 870 (6th Cir. 2001).)

If Brown satisfies her burden to establish a *prima facie* case of retaliation, "the burden shifts to [Excelda] to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Bryson*, 498 F.3d at 570.  If Excelda provides such a reason, "the burden shifts back to [Brown] to show that [Excelda's] proffered reason is a pretext for unlawful discrimination." *Id.*

As explained below, Brown failed to establish a *prima facie* case of FMLA retaliation because she has failed to show causation.  Even though her burden to establish causation is not an onerous one at the *prima facie* stage, she has failed to carry that burden.  Thus, her FMLA retaliation claim fails as a matter of law. Moreover, even if she had established a *prima facie* case of retaliation, Excelda would still be entitled to summary judgment because no reasonable juror could find that Excelda's proffered reason for firing Brown was pretext for unlawful retaliation.

**B**

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). Brown points to several pieces of evidence to support what she believes is a causal connection between her FMLA leave and her termination, but that evidence does not support an inference that her taking FMLA leave was "the likely reason" Excelda fired her.

**1**

Brown first attempts to show a causal connection through evidence of alleged disparate treatment. She cites three instances in which Excelda allegedly "treated [her] differently than Marvin Barnett, who did not have FMLA leave." (Pl.'s Resp. Br., ECF #27 at 22, Pg. ID 507.) She argues that this different treatment provides evidence of Excelda's animus toward FMLA leave and supports an inference that Excelda terminated her for taking that leave. While evidence of truly disparate treatment "is relevant to," and may support a finding of, causation, *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000), Brown has not shown that Excelda engaged in such treatment here.

15

**a**

Brown first identifies the incident in the kitchen on January 13, 2015, as an example of disparate treatment by Excelda. (*See* Pl.'s Resp. Br., ECF #27 at 23, Pg. ID 508.)  As described above, at 7:35 a.m. that morning, Wolfe found Brown and Barnett in the kitchen. (*See id.*; *see also* January 13, 2015 Discipline Notice, ECF #25-18 at 2, Pg. ID 474.)  Wolfe gave Brown a disciplinary coaching session for not being at her machine at the required time (*see id*), but Wolfe did not discipline Barnett. (*See* Barnett Dep. at 28, ECF #25-6 at 8, Pg. ID 367.)  At the time, Brown was on intermittent FMLA leave; Barnett was not. (*See id.* at 19, ECF #25-6 at 6, Pg. ID 365; Brown Dep. at 150-152, ECF #25-2 at 40, Pg. ID 216.)  Brown contends that Wolfe's different treatment of her and Barnett evidences an anti-FMLA bias. But evidence of disparate treatment supports an inference of causation only when it involves employees who are "similarly situated," *Nguyen*, 229 F.3d at 563, and Brown and Barnett were not similarly situated on the day in question.

To be similarly-situated, "the individual[] with whom the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Tennial v. United Parcel Service Inc.*, 840 F.3d 292,

16

309 (6th Cir. 2016). "Exact correlation is not required, however. Rather, the plaintiff and employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000).

Brown and Barnett were not similar in all relevant aspects during the kitchen incident on January 13, 2015. First, they worked in different departments that day: Brown in the production department and Barnett in the engineering department.[5] (*See* Barnett Dep. at 40-41, ECF #25-6 at 11-12, Pg. ID 370-71.) Second, they had different attendance obligations. As a member of the production department, Brown was required to be at her machine by 7:30 a.m. (*see* St. George Dep. at 18-20, ECF #25-4 at 6, Pg. ID 320); as a member of the engineering department, Barnett was not required to be in any particular location at any particular time. (*See* Barnett Dep. at 41, ECF #25-6 at 12, Pg. ID 371.) Third, they reported to different supervisors. Brown reported to Wolfe (*see* Brown Dep. at 161-162, ECF #25-2 at 43, Pg. ID 219); Barnett reported to Greg Gumbrick. (*See* Barnett Dep. at 41, ECF #25-6 at 12, Pg. ID 371.)

These differences are material. Indeed, it would have been entirely logical for Wolfe to discipline an employee under her supervision who was not in her required

---

[5] Barnett split his time between the production and engineering departments. He worked in the engineering department on Tuesdays. (*See* Barnett Dep. at 40-41, ECF #25-6 at 11-12, Pg. ID 370-71.) January 13, 2015 was a Tuesday.

workspace (Brown) while not disciplining an employee under someone else's supervision who was not absent from any particular required workspace (Barnett). Since Brown was part of Wolfe's crew, Brown's absence from her work station directly and negatively impacted the very production process that Wolfe was charged with overseeing.  Barnett's presence in the kitchen had no similar impact on matters under Wolfe's control.  Under these circumstances, Wolfe's decision to discipline Brown but not Barnett says nothing about whether Wolfe harbored an anti-FMLA animus.

### b

Brown next identifies her March 5, 2015 meeting with St. George as another example of disparate treatment. (*See* Pl.'s Resp. Br., ECF #27 at 24, Pg. ID 508; Brown Dep. at 192-206, ECF #25-2 at 50-54, Pg. ID 226-30.)  As described above, St. George met with Brown after she and Barnett left early together on February 23, 2015 and March 2, 2015. (*See* Brown Dep. at 192-206, ECF #25-2 at 50-54, Pg. ID 226-30*.*)  Brown points out that St. George did not have a similar meeting with Barnett. (*See id.*)  At the time of the meeting, Brown was on FMLA leave; Barnett was not.  Brown contends that St. George's decision to meet with her, but not Barnett, shows that St. George harbored anti-FMLA animus.

However, Brown and Barnett were not similarly-situated with respect to the primary issues that St. George raised during the meeting.  St. George focused on the

problems caused by Brown's reliance on her co-worker (Barnett) for transportation. He explained to Brown that "attendance is her responsibility, not [the responsibility] of the associate she carpools with, and that having a backup plan in situations where she could get another associate to give her a ride would be a good option." (*Id.* at 205, ECF #25-2 at 54, Pg. ID 230.)  There is no evidence in the record suggesting that Barnett ever needed to leave work early because of his reliance upon a co-worker for transportation.  Thus, St. George had no need to discuss a carpool backup plan with Barnett.  The fact that St. George did not call Barnett for a meeting (like the one he had with Brown) to discuss that issue thus says nothing about whether he harbored anti-FMLA bias.

During St. George's meeting with Brown, he also discussed issues related to her insubordination toward Wolfe and himself.  He told her that "being disrespectful towards a supervisor by yelling at them, refusing to listen, and barging out of the conference room would not be tolerated." (Brown Dep. at 209, ECF #25-2 at 55, Pg. ID 231.)  There is no evidence in the record that Barnett ever engaged in any similar inappropriate behavior.  Therefore, the fact that St. George met with Brown to discuss her misconduct, but did not convene a meeting with Barnett for the same purpose, says nothing about whether St. George had a negative view of Brown's FMLA leave.

**c**

Finally, Brown argues that Excelda's decision to terminate her, but not Barnett, for leaving early on May 14, 2015, is evidence of Excelda's disparate treatment. (*See* Pl.'s Resp. Br., ECF #27 at 23-24, Pg. ID 508-09.)  Brown points out that (1) she *and* Barnett left early on May 14, 2015, after receiving permission from Wolfe to do so, and (2) she was fired for "walking off the job," while Barnett was not punished in any manner. (*Id.*)  Brown contends that this is a clear instance of Excelda treating her less favorably than a similarly-situated employee who was not on FMLA leave.

But Excelda's *decision-makers* did not engage in any disparate treatment when they terminated Brown's employment.  Disparate treatment necessarily involves the treatment of more than one employee.  It exists where an employer is faced with two or more employees (plural) in materially similar circumstances and where the employer treats one of those employees in a less favorable manner. *See Int'l Bhd. Of Teamsters v. U.S.*, 431 U.S. 324, 335, n, 15 (1977) (explaining that disparate treatment involves treating some people differently from "others" based on a prohibited classification).  Here, the Excelda decision-makers who chose to terminate Brown's employment (St. George and Oliver) were not faced with a decision that involved similar conduct (or misconduct) by any employee other than Brown.  On the contrary, Wolfe reported to St. George and Oliver that Brown *alone*

20

walked off the job; Wolfe did not accuse Barnett of any wrongdoing or seek any disciplinary action against Barnett. (*See* Wolfe Dep. at 41, ECF #25-3 at 12, Pg. ID 308.)  Thus, at the time St. George and Oliver decided to fire Brown, they had no reason to believe that Barnett had committed any misconduct and, more importantly, they had no decision to make with respect to Barnett.  They were facing only a single decision about whether to fire a single employee (Brown).  Under these circumstances, their decision terminate Brown's employment did not amount to disparate treatment.

During the hearing before the Court, counsel for Brown suggested that even if Excelda's decision-makers, themselves, did not engage in disparate treatment of Brown and Barnett, Wolfe did so when she reported Brown but not Barnett for leaving early.  Counsel argued that Wolfe's disparate treatment was evidence of her anti-FMLA bias and that that bias should be imputed to the decision-makers under the so-called "cat's paw" theory.  But that theory does not fit the facts of this case.

Under the cat's paw theory, "the plaintiff seeks to hold [an] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014).  The theory applies where "a supervisor performs an act motivated by discriminatory animus *that is intended by the supervisor to cause an adverse employment action*" and where "that act is a proximate cause of the ultimate

employment action…." *Henderson v. Chrysler Group, LLC*, 610 Fed. App'x 488, 495-96 (6th Cir. 2015) (emphasis added) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) (internal brackets omitted)).

Here, Brown's reliance on the cat's paw theory fails because there is no evidence that Wolfe intended "to cause an adverse employment action" when she completed the disciplinary paperwork concerning Brown's May 14 departure. Wolfe did *not* request that Brown be terminated or subjected to any particular consequences. Instead, Wolfe merely completed a Coaching and Corrective Action Notice, and on that notice Wolfe recommended only a "written warning." (*See* Wolfe Dep. at 40, ECF #25-3 at 11, Pg. ID 307.)  Brown has not shown that the written warning Wolfe recommended amounted to an adverse action, nor has she attempted to distinguish the cases in which the Sixth Circuit has held that a warning does not constitute an adverse action. *See, e.g.*, *Creggett v. Jefferson Cty. Bd. of Educ.*, 491 Fed. App'x 561, 566 (6th Cir. 2012) (explaining that a written reprimand is not considered "an adverse employment action" unless it leads "to a materially adverse consequence such as lowered pay, demotion, suspension, or the like"); *Thomas v. Potter*, 93 Fed. App'x 686, 688 (6th Cir. 2004) (holding that a warning letter did not constitute adverse employment action).  In addition, there is no proof that Wolfe secretly hoped that the company would exceed her recommendation and take adverse action against Brown.  Because Brown has not identified any evidence that

22

Wolfe intended to cause an adverse employment action when Wolfe made the report that led to her (Brown's) termination, Brown may not use the cat's paw theory to impute Wolfe's alleged anti-FMLA animus to the decision-makers who made the termination decision.

Moreover, Brown's contention that Wolfe harbored an anti-FMLA animus (and that such animus explains Wolfe's decision to discipline Brown) strikes the Court as mere speculation.  Brown has not identified any evidence that Wolfe had any negative feelings about the FMLA or about employees taking FMLA leave.  Nor has Brown identified any proof that Wolfe had any concerns about Brown's use of FMLA leave in particular.  Indeed, Brown had used FMLA leave multiple times while under Wolfe's supervision without any pushback from Wolfe. (*See* Brown Time Card, ECF #25-15; Brown Dep. at 152, ECF #25-2 at 40, Pg. ID 216.)  And while there was open hostility between Wolfe and Brown, that hostility related to Brown's tardy arrivals at her machine, (*see* Brown Dep. at 181-86, ECF #25-2 at 48-49, Pg. ID 224-25), not to Brown's FMLA leave.  There is simply no basis on which to conclude that Wolfe's actions toward Brown had anything to do with the FMLA.  This further undermines Brown's reliance on the cat's paw theory to establish that her termination amounted to disparate treatment.

23

For all of these reasons, Excelda's decision to terminate Brown's employment does not amount to disparate treatment and, accordingly, does not support an inference of causation.

**2**

Brown alleges in her Amended Complaint – and appears to suggest in her summary judgment response brief (in a single sentence that is unsupported by a citation to even a single case) – that she has made a *prima facie* showing of causation through evidence of temporal proximity. (Am. Compl. ¶48, ECF #10 at 9, Pg. ID 48; Pl.'s Resp. Br., ECF #27 at 24, Pg. ID 509.)  The Court disagrees.

Brown's temporal proximity argument focuses on "the close temporal proximity between" (1) Excelda's approval of her intermittent FMLA leave on August 14, 2014, and (2) a written warning that Harris issued to Brown four days later, on August 18, 2014. (Am. Compl. ¶48, ECF #10 at 9, Pg. ID 48; *see also* August 2014 FMLA Designation Notice, ECF #25-14 at 2, Pg. ID 438.)  In that written warning, Harris admonished Brown for misconduct occurring three months earlier. (*See* August 18 Coaching and Corrective Action Notice, ECF #25-10 at 27, Pg. ID 419.)  Brown does not dispute the legitimacy of the warning, (Brown Dep. at 155-156, ECF #25-2 at 41), but she insists that the closeness in time between the warning and the approval of her FMLA leave is sufficient to satisfy her burden to show causation at the *prima facie* stage. (*See* ECF #27 at 24, Pg. ID 509.)

24

There are two problems with this temporal proximity argument.  First, the relevant temporal proximity is "proximity between the protected activity and the *adverse employment action*," *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (emphasis added), and, as noted above, Brown has failed to show that the written warning in August 2015 amounted to an adverse action. (*See* Section III(B)(1)(c), *supra*.)  Nor has Brown cited any authority to support her contention that she may establish causation by showing temporal proximity between protected activity (like her FMLA leave) and a single disciplinary action *short* of an adverse employment action (like the August 2014 warning).[6]  Thus, Brown has failed to demonstrate that the proximity between the lone warning in August of 2014 and the approval of her FMLA leave establishes the required causation.

Second, even if the written warning did amount to an adverse action, Brown has failed to show that it is the *relevant* adverse action for purposes of showing causation through temporal proximity.  Again, the Sixth Circuit has explained that a plaintiff may, in some instances, show causation at the *prima facie* stage by

---

[6] There is authority that supports the opposite proposition – that temporal proximity between protected activity and a warning is not sufficient to show causation at the *prima facie* stage. *See, e.g., Kimbrough v. Cincinnati Assoc. for the Blind and Visually Impaired*, 986 F.Supp.2d 904, 918 (S.D. Ohio 2013) (holding that temporal proximity between protected activity and warning was "not relevant" because the warning was "not an actionable adverse action" and further holding that "the relevant time gap is the proximity of the adverse action … [the] termination, to the alleged protected activity….").

demonstrating temporal proximity "between the protected activity and *the* adverse employment action," *DiCarlo,* 358 F.3d at 421 (emphasis added) – i.e., the adverse action that is the subject of the plaintiff's claim.  The written warning in August 2015 is not "the adverse action" that is the subject of Brown's claim. (*See* Am. Compl. ¶44, ECF #10 at 8, Pg. ID 47; identifying only one adverse action: Brown's termination.)  Brown has not cited any authority holding that a plaintiff may show causation by demonstrating a close temporal proximity between protected activity and a single adverse action that is *not* the subject of her claim. [7]  Simply put, Brown has not persuaded the Court that the proximity between her FMLA leave and the warning establishes causation.

Finally (and on a somewhat different note), Brown argues that the delayed nature of the written warning – issued by Harris nearly four months after the underlying misconduct – supports a finding of causation. (Pl.'s Resp. Br. ECF #27 at 24, Pg. ID 509.)  But the record is clear that Harris similarly delayed in issuing written warnings *before* Brown began the FMLA leave at issue.  For instance, in

---

[7] Brown does not appear to argue that there is a sufficiently close temporal proximity between the approval of her FMLA leave and her termination nine months later, and the decision to withhold that argument seems appropriate.  The Sixth Circuit has declined to find causation where the adverse action followed the protected activity by 2-7 months. *See, e.g.*, *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (discipline 2-5 months after protected activity insufficient to establish causation); *Henderson*, 610 Fed. App'x at 494 (adverse employment action 6-7 months after FMLA request insufficient to establish causation).

April 2012, he issued a written warning for conduct occurring in January 2012. (*See* April 17, 2012 Coaching and Corrective Action Notice, ECF #25-10 at 25, Pg. ID 417; *See also*, Brown Dep. at 130, ECF #25-2 at 35, Pg. ID 211, confirming the three month delay in the April 2012 discipline.)  Because Harris delayed in disciplining Brown *before* her FMLA leave, the delayed timing of the August 2014 written warning does support an inference that Excelda's termination of Brown was related to her FMLA leave.

### 3

Brown also argues that the Court may infer causation from the fact that after Excelda approved her for FMLA leave, it imposed heightened discipline upon her in violation of its own policies.  For instance, she contends that on more than one occasion, Excelda issued a written warning for a disciplinary infraction that warranted only a coaching session under Excelda's written discipline policy. (*See* Pl.'s Resp. Br., ECF #27 at 24-26, Pg. ID 509-511.)  But Brown admits that Excelda began disciplining her in excess of its written policies in 2012 or 2013 – years *before* Brown's 2014 FMLA request or approval. (*See* Pl.'s Resp. Br., ECF #27 at 16, Pg. ID 501.)  Thus, even if Excelda violated its own discipline policies after Brown took FMLA leave, the record does not support an inference that those violations related to her FMLA leave.

**4**

Finally, Brown suggests that a causal connection can be inferred from a statement made by St. George during his March 5, 2015 meeting with her.  At that time, St. George told Brown that "any further time off needed to be pre-planned and excused." (Pl.'s Resp. Br., ECF #27 at 23, Pg. ID 508; *see also*, Brown Dep. at 204, ECF #25-2 at 53, Pg. ID 229, confirming that St. George made this statement at the March 5, 2015 meeting.)  Brown contends that, by definition, intermittent FMLA leave cannot be pre-planned, and she thus insists that St. George's pre-planning requirement demonstrates his anti-FMLA bias and supports an inference that he fired her because she took FMLA leave.

But the context and aftermath of St. George's statement make clear that he was not referring to FMLA leave when he mentioned the time off that had to be pre-planned.  St. George referenced pre-planning as part of his discussion with Brown concerning her recurring need to leave early on short notice because she was at the mercy of her carpool partner, Barnett. (*See* Brown Dep. at 204, ECF #25-2 at 53, Pg. ID 229.)  There is no evidence that St. George ever mentioned the FMLA or FMLA leave during this discussion.  And there is no evidence that Brown understood St. George to be referring to FMLA leave as the type of time off that needed to be pre-planned.  Indeed, after this conversation with St. George, Brown took intermittent FMLA leave (*see* Brown Time Card, ECF #25-15 at 19-22, Pg. ID 461-64), and there

28

is no proof that she attempted to pre-plan that leave.  Nor is there any evidence that St. George ever objected to Brown's post-March 5 intermittent FMLA leave on the ground that she did not pre-plan that leave.  Under these circumstances, St. George's isolated reference to pre-planning time off does not support an inference that he harbored any hostility toward Brown's intermittent FMLA leave or that he fired her because she took that leave.

For all of the reasons explained above, the Court concludes that Brown has failed to establish the causation element of her *prima facie* case and that Excelda is therefore entitled to summary judgment.

## C

Even if Brown had established her *prima facie* case, Excelda would still be entitled to summary judgment because it has offered a legitimate, non-discriminatory reason for her firing – leaving early without permission on May 14, 2015 – and Brown has not shown that that reason was a pretext for anti-FMLA retaliation.

"To demonstrate pretext, a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (emphasis in original) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).  Stated another way, a plaintiff must "present evidence from which a

29

reasonable jury could find" that "unlawful retaliation in fact was" the employer's real reason for taking the adverse action. *Id.* Brown has failed to do so.

The record contains powerful evidence that Excelda did *not* harbor any anti-FMLA bias. Indeed, the record contains ample evidence that Excelda was more than willing to accommodate Brown's need for time off to attend to health issues. Excelda approved and administered two prior FMLA leaves for Brown without incident (*see* Brown Dep. at 52, 110, ECF #25-2 at 15, 30, Pg. ID 191, 206), and Excelda even gave Brown substantial time off (to which she was not entitled) to care for her ailing sister. (*See id.* at 88-89, ECF #25-2 at 24-25, Pg. ID 200-01.) Moreover, there is no evidence in the record that any Excelda employee ever objected to, or raised any concern about, Brown's FMLA leave. Furthermore, even after Excelda approved Brown's most recent FMLA leave, it passed up opportunities to discipline her for serious misconduct. For instance, Excelda did not take action against Brown for her serious insubordination directed toward St. George and Wolfe in January 2015. And, while Brown was on her most recent FMLA leave, Oliver *rejected* Brown's own request to be fired. (*See* Oliver Dep. at 25-26, ECF #25-5 at 8, Pg. ID 346.) Simply put, the record contains persuasive evidence that Excelda harbored no animus toward Brown related to her FMLA leave and that Excelda did not terminate her employment based upon such alleged animus.

Brown has not countered with proof that her FMLA leave played any role in her termination.  Instead, she offers only her evidence of causation – which the Court found lacking for the reasons explained above – and she also argues that Excelda had no basis in fact to terminate her because she had permission to leave on May 14, 2015.  But even if Brown could show that Excelda's reason for firing her was without factual support, Excelda would still be entitled to summary judgment because, for all of the reasons explained above, on this record, "no rational factfinder could conclude that" Excelda fired Brown as retaliation for her leave under the FMLA. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000) (holding that even where an employee establishes a *prima facie* case and sets forth a basis to reject the employer's proffered reason for the discharge, an employer may be entitled to judgment as a matter of law where no rational factfinder could find discrimination).[8]

## IV

Brown has failed to establish a causal connection between her FMLA leave and Excelda's decision to terminate her employment, and she has failed to show that Excelda's proffered reason for firing her was a pretext for anti-FMLA retaliation.

---

[8] While the Supreme Court in *Reeves* was addressing a motion under Rule 50 of the Federal Rules of Civil Procedure, the decision also applies in the summary judgment context. *See Ford Motor Co*., 782 F.3d at 767 (citing *Reeves* in summary judgment context).

Therefore, Excelda is entitled to summary judgment on Brown's retaliation claim under the FMLA.

Accordingly, **IT IS HEREBY ORDERED** that Excelda's motion for summary judgment (ECF #25) is **GRANTED.**

                                    s/Matthew F. Leitman
                                    MATTHEW F. LEITMAN
Dated: April 6, 2017                UNITED STATES DISTRICT JUDGE


        I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 6, 2017, by electronic means and/or ordinary mail.

                                    s/Holly A. Monda
                                    Case Manager
                                    (313) 234-5113